# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DR. ELI INZLICHT-SPREI, on Behalf of Himself and All Others Similarly Situated, | Case No.: _____ |
| Plaintiff, | CLASS ACTION |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| AETNA, INC., MARK T. BERTOLINI, FRANK M. CLARK, FERNANDO AGUIRRE, JOSEPH P. NEWHOUSE, ELLEN M. HANCOCK, EDWARD J. LUDWIG, MOLLY J. COYE, ROGER N. FARAH, BETSY Z. COHEN, JEFFREY E. GARTEN, RICHARD J. HARRINGTON, and OLYMPIA J. SNOWE, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Dr. Eli Inzlicht-Sprei ("Plaintiff"), on behalf of himself and all others similarly situated, upon information and belief, including an examination and inquiry conducted by and through his counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal belief, alleges the following for his Class Action Complaint:

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder class action brought by Plaintiff on behalf of himself and all other public shareholders of Aetna, Inc. ("Aetna" or the "Company") against Aetna and the members of Aetna's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9 and Regulation G, 17 C.F.R. § 240.100, and to enjoin the vote on a proposed transaction (the "Proposed Transaction"), pursuant to which Aetna will be acquired

by CVS Health Corporation ("Parent"), through its wholly-owned subsidiary Hudson Merger Sub Corp. ("Merger Sub" and, together with Parent, "CVS").

2.     On December 3, 2017, Aetna and CVS issued a joint press release announcing they had entered into an Agreement and Plan of Merger (the "Merger Agreement") under which CVS will acquire all outstanding shares of Aetna for $145.00 in cash and 0.8378 shares of CVS common stock per share, which would value Aetna at approximately $207.94 per share (the "Merger Consideration").  Pursuant to the Merger Agreement, Merger Sub will merge with and into the Company, with the Company surviving the merger as an indirect wholly owned subsidiary of CVS. The Proposed Transaction is valued at approximately $77 billion.

3.     On January 4, 2018, the Board authorized the filing of a materially misleading and incomplete Registration Statement on Form S-4 (the "Registration Statement") with the SEC.  The Registration Statement, which recommends that Aetna shareholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) Aetna's financial projections, relied upon by Aetna's financial advisor, Lazard Frères & Co. LLC ("Lazard") and Lazard and Allen & Company ("Allen"), in its financial analyses; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Lazard; (iii) the background process leading to the Proposed Transaction, including the terms and details surrounding any alternative indications of interest in the Company solicited or received from any other company; and (iv) the actual value of the Merger Consideration.  The failure to adequately disclose such material information constitutes a violation of the above-referenced sections of the Exchange Act, as Aetna shareholders need such information to cast a fully-informed vote or make an appraisal decision in connection with the Proposed Transaction.

4.      As detailed herein, the Merger Consideration that Aetna stockholders stand to receive in connection with the Proposed Transaction and the process by which Defendants propose to consummate the Proposed Transaction are unfair to Plaintiff and the other common shareholders of the Company.  In violation of the Exchange Act, Defendants are asking Plaintiff and Aetna's other public shareholders to vote in favor of the Proposed Transaction based on the materially incomplete and misleading Registration Statement.

5.      In short, unless remedied, Aetna's public shareholders will be forced to make a voting decision on the Proposed Transaction without receiving full disclosure of all material information concerning the Proposed Transaction.  Plaintiff seeks to enjoin the shareholder vote on the Proposed Transaction unless and until such omitted material information is provided to Aetna's shareholders or, in the event the Proposed Transaction is consummated, Plaintiff seeks to recover damages resulting from the Defendants' Exchange Act violations.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

7.      This Court has jurisdiction over the Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, most of the documents are electronically stored, and the evidence exists.  Aetna is incorporated in

Pennsylvania and is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

9.      Plaintiff is, and has been at all times relevant hereto, the owner of Aetna common stock.

10.      Defendant Aetna is a Pennsylvania corporation with its principal executive offices located at 151 Farmington Avenue, Hartford, CT 06156.  Aetna is an American-managed health care company, which sells traditional and consumer directed health care insurance plans and related services, such as medical, pharmaceutical, dental, behavioral health, long-term care, and disability plans.  The Company's common stock is traded on the New York Stock Exchange under the ticker symbol "AET."

11.      Defendant Mark T. Bertolini ("Bertolini") has served as Chief Executive Officer ("CEO") of Aetna since November 29, 2010 and Chairman of the Board since April 8, 2011.  From July 2007 to December 2014, he also served as Aetna's President.

12.      Defendant Frank M. Clark ("Clark") has served as a director of Aetna since June 29, 2006.

13.      Defendant Fernando Aguirre ("Aguirre") has served as a director of Aetna since July 29, 2011.

14.      Joseph P. Newhouse ("Newhouse") has served as a director of Aetna since September 28, 2001.

15.      Defendant Ellen M. Hancock ("Hancock") has served as a director of Aetna since 1995.

16.    Edward J. Ludwig ("Ludwig") has served as a director of Aetna since June 27, 2003.  He is also designated the Board's Lead Independent Director.

17.    Molly J. Coye ("Coye") has served as a director of Aetna since September 30, 2005.

18.    Roger N. Farah ("Farah") has served as a director of Aetna since June 28, 2007.

19.    Defendant Betsy Z. Cohen ("Cohen") has served as a director of Aetna since 1994.

20.    Jeffrey E. Garten ("Garten") has served as a director of Aetna since 2000.

21.    Richard J. Harrington ("Harrington") has served as a director of Aetna since September 26, 2008.

22.    Olympia J. Snowe ("Snowe") has served as a director of Aetna since July 24, 2014.

23.    Defendants Bertolini, Clark, Aguirre, Newhouse, Hancock, Ludwig, Coye, Farah, Cohen, Garten, Harrington, and Snowe are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Aetna, "Defendants."

## OTHER RELEVANT ENTITIES

24.    Parent CVS is a Delaware corporation with its principal executive offices located at One CVS Drive, Woonsocket, Rhode Island, 02895.  Parent is an American retail pharmacy and health care company.  Parent's common stock is traded on the New York Stock Exchange under the ticker symbol "CVS."

25.    Merger Sub is a Pennsylvania corporation and an indirect wholly owned subsidiary of CVS.

## CLASS ACTION ALLEGATIONS

26.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Aetna common stock (the "Class").  Excluded from the Class are Defendants and their affiliates, immediate families, legal

representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

27.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

28.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of December 28, 2017, there were approximately 327 million shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by Aetna or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

29.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

30.     Plaintiff will fairly and adequately protect the interests of the Class and has no interest contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

31.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

32.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

**Company Background and Strong Financial Outlook**

33.     Aetna was founded in 1853 and operates as a health care benefits company across the United States.  It operates through three segments:  Health Care, Group Insurance, and Large Case Pensions.

34.     The Health Care segment offers medical, dental, behavioral health, pharmacy benefit management service, and vision plans on an insured and employer-funded basis.  It also provides point-of-service, preferred provider organization, health maintenance organization, and indemnity benefit plans, as well as health savings accounts and consumer-directed health plans. In addition, the Health Care segment offers Medicare and Medicaid products and services, as well as other medical products, such as medical management and data analytics services, medical stop loss insurance, workers' compensation administrative services, and products that provide access to its provider networks in select geographies.

35.     The Group Insurance segment offers life insurance products, including group term life insurance, voluntary spouse and dependent term life insurance, group universal life insurance, and accidental death and dismemberment insurance; disability insurance products; and long-term care insurance products, which provide the benefits to cover the cost of care in private home settings, adult day care, assisted living, or nursing facilities.

36.     The Large Case Pensions segment manages various retirement products, including pension and annuity products primarily for tax-qualified pension plans.  The Company provides its products and services to employer groups, individuals, college students, part-time and hourly workers, health plans, health care providers, governmental units, government-sponsored plans, labor groups, and expatriates.

37.     Prior to entering into the Merger Agreement, Aetna's business was thriving.  In fact, the Company was in such a position of strength that it sought to acquire a key competitor, Humana Inc. ("Humana").  Aetna initiated the process to acquire Humana in August 2016, but the merger was ultimately enjoined by the United States Department of Justice on January 23, 2017.

38.     On August 3, 2017, Aetna issued a press release announcing its second quarter 2017 financial results and highlights, including:

- **Net income** was $1.2 billion for second-quarter 2017 compared with $791 million for second-quarter 2016.  The significant increase in net income during second-quarter 2017 was primarily due to the increase in adjusted earnings described below and lower transaction and integration-related costs in 2017 compared to 2016.

- **Adjusted earnings** were $1.1 billion for second-quarter 2017 compared with $783 million for second-quarter 2016.  The substantial increase in adjusted earnings during second-quarter 2017 was primarily due to continued strong performance in Aetna's Health Care segment.  The increase also reflects a larger decrease in Aetna's estimate of risk adjustment payables for the prior year for its individual and small group ACA compliant products in the second quarter of 2017 compared to the second quarter of 2016.

                          *        *        *

- **Total company expense ratio** was 16.4 percent and 17.5 percent for the second quarters of 2017 and 2016, respectively.  The adjusted expense ratio was 16.5 percent and 17.1 percent for the second quarters of 2017 and 2016, respectively.  The improvement in both ratios during 2017 was primarily due to the temporary suspension of the HIF [health insurer fee] in 2017 and the execution of Aetna's expense management initiatives, partially offset by targeted investment spending on Aetna's growth initiatives.  The total

company expense ratio also improved due to lower transaction and integration-related costs in second-quarter 2017 compared to 2016.

- **After-tax net income margin** was 7.7 percent and 5.0 percent for second quarters of 2017 and 2016, respectively. The adjusted pre-tax margin was 11.7 percent and 8.9 percent for the second quarters of 2017 and 2016, respectively. The improvement in both second-quarter 2017 ratios was primarily due to continued strong performance in Aetna's Health Care segment. The improvement in the adjusted pre-tax margin was partially offset by the negative impact of the temporary suspension of the HIF in 2017.

- **Total debt to consolidated capitalization ratio** was 37.3 percent at June 30, 2017 compared with 53.6 percent at December 31, 2016. The total debt to consolidated capitalization ratio at June 30, 2017 reflects the repayment of approximately $11.6 billion aggregate principal amount of Aetna's senior notes during 2017.

39. Commenting on the results, Defendant Bertolini stated:

Our strong second quarter results speak to our continued focus on disciplined pricing and execution of our targeted growth strategy. Based on our continued outperformance, we are once again increasing our full-year 2017 earnings projections.

40. In the press release, non-party Shawn M. Guertin ("Guertin"), Aetna's Executive Vice President, Chief Financial Officer, and Chief Enterprise Risk Officer, stated:

Our core businesses continued to outperform during the second quarter, carrying forward positive momentum from the start of the year. Additional 2017 earnings power allows us to improve our full-year outlook while also accelerating our timeline for targeted investments in growth initiatives.

41. Then, on October 31, 2017, the Company issued a press release announcing its third quarter financial results and highlights, including:

- **Net income** was $838 million for third-quarter 2017 compared with $604 million for third-quarter 2016. The increase in net income during third-quarter 2017 was primarily due to the increase in adjusted earnings described below and lower transaction and integration-related costs in 2017 compared to 2016.

- **Adjusted earnings** were $814 million for third-quarter 2017 compared with $734 million for third-quarter 2016. The increase in adjusted earnings

during third-quarter 2017 was primarily due to continued strong performance in Aetna's Health Care segment.

\*       \*       \*

- **Total company expense ratio** was 17.4 percent and 17.9 percent for the third quarters of 2017 and 2016, respectively. The adjusted expense ratio was 17.5 percent and 17.6 percent for the third quarters of 2017 and 2016, respectively. The improvement in both ratios during 2017 was primarily due to the temporary suspension of the HIF in 2017 and the continued execution of Aetna's expense management initiatives, largely offset by targeted investment spending on Aetna's growth initiatives. The total company expense ratio also improved due to lower transaction and integration-related costs in third-quarter 2017 compared to 2016.

- **After-tax net income margin** was 5.6 percent and 3.8 percent for the third quarters of 2017 and 2016, respectively. The adjusted pre-tax margin was 9.2 percent and 8.5 percent for the third quarters of 2017 and 2016, respectively. The improvement in both third-quarter 2017 ratios was primarily due to continued strong performance in Aetna's Health Care segment. The improvement in the adjusted pre-tax margin was partially offset by the negative impact of the temporary suspension of the HIF in 2017.

- **Total debt to consolidated capitalization ratio** was 39.5 percent at September 30, 2017 compared with 53.6 percent at December 31, 2016. The total debt to consolidated capitalization ratio at September 30, 2017 reflects (i) Aetna's decision to pre-fund debt maturities of approximately $1.0 billion coming due in the fourth quarter of 2017 with the issuance of $1.0 billion aggregate principal amount of senior notes during the third quarter of 2017 and (ii) the repayment of approximately $11.6 billion aggregate principal amount of Aetna's senior notes during the first half of 2017.

42.     Commenting on these results, Defendant Bertolini stated:

Our third-quarter results are a continuation of our momentum from the first half of the year. Our tireless focus on service and quality are evident in the recently released 2018 Medicare star ratings. For the third year in a row Aetna has the leading position among publicly-traded companies with the highest percentage of members in plans rated four stars or higher.

43.     Again, Guertin expressed optimism by stating:

The strength of our core business fundamentals in the third-quarter was driven by disciplined pricing, moderate medical cost trend and focused execution. We are

once again increasing our full year 2017 earnings projections to reflect the continued strength of our operating results year to date.

44.     The Company's stock price reflected this strong financial performance.  As of September 2017, Aetna's shares had gained 31.2% to date, outperforming the industry's growth of 27%, as well as the S&P 500's 11.6% returns.

45.     As the Individual Defendants were discussing the Proposed Transaction with CVS and entering into the Merger Agreement, Aetna's value was improving and was primed to increase, and the Company was positioned for future growth.  In light of the Company's strong position, the Merger Consideration is inadequate.

**The Sale Process**

46.     Beginning in March 2017, Aetna and CVS began discussions regarding potentially working more closely together, and on April 4, 2017, they held in-person meetings to discuss the potential options, including a strategic partnership, joint venture, or other opportunity.

47.     During May 2017, members of Aetna's senior management had telephonic meetings with CVS's senior management as well as two other retail and health care industry participants, Party X and Party Y.  Discussions with Party Y led to a pilot program beginning in May 2017, wherein Aetna's members in an unspecified state visited Party Y's retail health-service clinics.

48.     On May 23, 2017, Defendant Bertolini, Guertin, and other members of Aetna's management met with CVS's management to discuss the potential benefits of working more closely together, including potential strategic partnerships, joint ventures, business combinations, and other opportunities.

49.     On June 7, 2017, Aetna and CVS executed a mutual NDA containing a mutual twelve-month standstill provision.

50.     On June 14, 2017, Aetna and Party X entered into a mutual NDA containing a nine-month standstill provision.  Under the terms of the NDA, Party X is currently allowed to make a proposal to Aetna regarding a potential business combination.

51.     From June 2017 to September 2017, members of Aetna management met with members of management from CVS, Party X, and Party Y regarding potential strategic partnerships, joint ventures, and other opportunities and discussed, among other things, potential benefits and operating models.

52.     On July 14, 2017, Aetna and Party Y discussed a potential strategic partnership or joint venture between the parties regarding retail health services.

53.     On July 20, 2017, the Aetna Board held a regularly scheduled meeting, during which the Board reviewed the Company's strategic plan and a potential new integrated health care operating model.

54.     On August 7, 2017, Aetna management met with Party X to continue their previous discussions regarding potential benefits of working more closely together, including a potential strategic partnership, business combination, or other opportunities.

55.     On September 7, 2017, Aetna and Party Y met to discuss a potential strategic partnership or joint venture between the parties regarding retail health services.

56.     On September 25, 2017, Defendant Bertolini and Guertin met with executives of CVS to discuss a potential strategic partnership, joint venture, business combination, or other opportunity.  At this meeting, CVS expressed concerns regarding the potential challenges of a strategic partnership or joint venture and indicated a potential desire on the part of CVS to move forward with a business combination with Aetna.

57.     On September 29, 2017, the Aetna Board held a regularly scheduled meeting.  At the meeting, the Board received an update from management on discussions with CVS and reviewed the potential new integrated health care operating model previously discussed with the Board at their July 20, 2017 meeting.

58.     On October 11, 2017, Defendant Bertolini received a letter from CVS CEO, Larry J. Merlo, containing a nonbinding indication of interest from CVS to acquire all of the outstanding Aetna common shares for an aggregate purchase price of $195.00 per share consisting of approximately 55% in cash and 45% in shares of CVS common stock.  The letter indicated that CVS would be open to discussing representation for Aetna's directors on the board of directors of the combined company consistent with comparable precedent transactions and that CVS expected there to be a significant opportunity for Aetna management to be part of the combined company.

59.     On October 13, 2017, Aetna and Party X met and the CEO of Party X indicated that, while Party X remained interested in a strategic partnership or joint venture with Aetna, Party X was not presently in a position to make a proposal to acquire Aetna.

60.     That same day, Aetna met with Party Y to discuss certain publicly available business information regarding the companies and a potential strategic partnership or joint venture between the parties regarding retail health services.

61.     On October 15, 2017, the Aetna Board held a telephonic special meeting, during which the Board discussed CVS's letter, the terms of its indication of interest, potential next steps, and information that would be needed in advance of responding to CVS's letter.  After discussion, the Aetna Board directed management to obtain additional information from CVS regarding CVS's proposed operating model for the combined company and regarding regulatory considerations so that the Board could better understand and evaluate CVS's proposal.

62.    On October 18, 2017, Aetna and Party Y entered into a mutual NDA, which does not restrict Party Y from making a proposal to Aetna regarding a potential business combination transaction with Aetna.

63.    During market trading hours on October 26, 2017, the *Wall Street Journal* reported that there had been discussions between Aetna and CVS regarding a potential acquisition of Aetna by CVS.

64.    The next day, on October 27, 2017, the Aetna Board met and discussed CVS's indication of interest and the terms of its proposal, and analyzed a potential combination with CVS against other potential partners and other strategic alternatives, including remaining a stand-alone company, and the potential transactions under discussion with Party X and Party Y, as well as the unlikelihood that either Party X or Party Y would currently be interested in a potential business combination transaction with Aetna.   After these discussions, the Board directed Aetna's management to conduct a due diligence review of CVS, including with respect to certain litigation and regulatory matters, to evaluate whether to pursue the Proposed Transaction.

65.    On November 1, 2016, CVS delivered an initial draft merger agreement for the Proposed Transaction to Aetna.

66.    On November 10, 2017, Aetna and Party Y met to discuss a potential strategic partnership or joint venture between the parties regarding retail health services.

67.    On November 11, 2017, Aetna and CVS and their respective advisors met for a diligence presentation by Aetna management.  At this meeting, CVS conveyed its revised proposal to increase the cash component of the proposed purchase price to approximately 70%, with the remaining 30% to be paid in shares of CVS common stock.

68.     On November 14, 2017, the Aetna Board held a special meeting.  At the meeting, the Board continued its discussion of CVS's indication of interest and the terms of its proposal, including in the context of Aetna's stand-alone strategic plan.  Defendant Bertolini briefed the Board on CVS's revised proposal, including the increase in the cash component of the proposed purchase price to approximately 70%, with the remaining 30% to be paid in shares of CVS common stock and discussed Aetna's stand-alone strategic plan as well as management's views on the potential operating model and potential synergies of the combined company.  After this discussion, the Board directed management to commence negotiations on the terms and conditions of the Merger Agreement and to indicate to CVS and its advisors that CVS's proposed purchase price would need to be increased meaningfully.

69.     On November 15, 2017, Aetna's financial advisors communicated to CVS's financial advisors that CVS needed to increase its proposed purchase price meaningfully and that Aetna was focused on the certainty of closing as well as the potential operating model of the combined company.  CVS's financial advisors requested a specific proposal on price, which Aetna's financial advisors declined to provide.

70.     On November 20, 2017, the Aetna Board held a special meeting to discuss negotiations with CVS.  After discussions, the Board directed management to continue Aetna's due diligence review of CVS and negotiation of the Merger Agreement and determined to continue its discussions at the next regularly scheduled Board meeting, scheduled December 1, 2017.

71.     On November 22, 2017, Defendant Bertolini and Merlo met to discuss the Proposed Transaction, including the proposed operating model for the combined company and the management of the health care benefits business of the combined company.

72.     On November 27, 2017, Merlo sent a letter to Defendant Bertolini setting forth the terms of CVS's revised proposal.  The terms included:  (i) an increase in the consideration to be offered to Aetna shareholders to $203.00 per Aetna common share, which would be paid approximately 70% in cash and 30% in shares of CVS common stock, with the stock portion of the consideration to be based on a fixed exchange ratio to be agreed before signing of the Merger Agreement, (ii) a termination fee of $1.7 billion payable by CVS in the event the transaction does not close because of the failure to obtain required regulatory approvals (the "Regulatory Termination Fee"), and (iii) the addition of two Aetna directors, including Defendant Bertolini, to the CVS board of directors upon the closing of the transaction.

73.     On November 28, 2017, the Aetna Board held a special meeting to discuss the terms of CVS's revised proposal and the status of negotiations with CVS over the terms and conditions of the Merger Agreement, including the Regulatory Termination Fee, and discussions with CVS regarding the potential strategy and operating model for the combined company.  The Board then discussed CVS's revised proposal and authorized management to seek a higher purchase price from CVS.

74.     At a November 29, 2017 meeting between Aetna and CVS management, Guertin made a revised proposal on behalf of Aetna.  Its terms included:  (i) a purchase price of $207.00 per Aetna common share, which would be paid approximately 70% in cash and 30% in shares of CVS Health common stock, with the stock portion of the consideration to be based on a fixed exchange ratio to be agreed before signing of the merger agreement, (ii) a Regulatory Termination Fee of $2.5 billion, (iii) the addition of three Aetna directors, including Defendant Bertolini, to the CVS board of directors upon the closing of the transaction, and (iv) certain agreements as to the maintenance of the "Aetna" brand and Aetna Foundation, Inc. for specified periods of time

following the closing of the transaction.  Later in the day, CVS advised Aetna that CVS's proposed purchase price of $207.00 per Aetna common share consisted of $145.00 in cash and $62.00 in shares of CVS common stock.

75.     On November 30, 2017, management of the companies agreed, subject to the approval of Aetna's and CVS's respective boards of directors, to be 0.8378 shares of CVS common stock per Aetna common share.

76.     That evening, both boards of directors held special meetings to discuss the recent developments in the merger negotiations.  Defendant Bertolini updated the Board on the status of negotiations with CVS regarding the terms of the Proposed Transaction, including with respect to price, the Regulatory Termination Fee, and CVS's agreement to the addition of three Aetna directors, including Defendant Bertolini, to the CVS Board upon the closing of the Proposed Transaction.  During the discussions of the Board at this meeting, Defendant Bertolini expressed his view that the Proposed Transaction with CVS was in the best interests of Aetna and its shareholders.

77.     On December 1, 2017, the Aetna Board held its regularly scheduled meeting and discussed certain aspects of the Proposed Transaction with CVS.  The Board directed management to continue to negotiate the terms of the potential transaction and decided to hold another meeting to continue its discussion of the proposed transaction on December 3, 2017.

78.     On the morning of December 3, 2017, the Aetna Board held a special meeting.  The meeting was also attended by Aetna's advisors.  Lazard and Allen reviewed their respective financial analyses of the Merger Consideration with the Board, and each separately rendered an oral opinion, confirmed by delivery by each of a written opinion dated December 3, 2017, to the Aetna Board to the effect that the Proposed Transaction was fair, from a financial point of view,

to Aetna's public shareholders.  The Aetna Board then unanimously voted to approve the Merger

Agreement.

79.     That evening, Aetna and CVS entered into the Merger Agreement and issued a joint

press release announcing the Proposed Transaction.

**The Proposed Transaction**

80.     On December 3, 2017, Aetna and CVS issued a joint press release announcing the

Proposed Transaction.  The press release states, in relevant part:

> WOONSOCKET, R.I. and HARTFORD, Conn., Dec. 3, 2017 /PRNewswire/ -- CVS Health (NYSE: CVS), a company at the forefront of changing the health care landscape, and Aetna (NYSE: AET), one of the nation's leading diversified health care benefits companies, today announced the execution of a definitive merger agreement under which CVS Health will acquire all outstanding shares of Aetna for a combination of cash and stock.  Under the terms of the merger agreement, which has been unanimously approved today by the boards of directors of each company, Aetna shareholders will receive $145.00 per share in cash and 0.8378 CVS Health shares for each Aetna share.  The transaction values Aetna at approximately $207 per share or approximately $69 billion.  Including the assumption of Aetna's debt, the total value of the transaction is $77 billion.

> This transaction fills an unmet need in the current health care system and presents a unique opportunity to redefine access to high-quality care in lower cost, local settings [–] whether in the community, at home, or through digital tools.

> CVS Health President and Chief Executive Officer Larry J. Merlo said, "This combination brings together the expertise of two great companies to remake the consumer health care experience.  With the analytics of Aetna and CVS Health's human touch, we will create a health care platform built around individuals.  We look forward to working with the talented people at Aetna to position the combined company as America's front door to quality health care, integrating more closely the work of doctors, pharmacists, other health care professionals and health benefits companies to create a platform that is easier to use and less expensive for consumers."

> This is a natural evolution for both companies as they seek to put the consumer at the center of health care delivery.  CVS Health has steadily become an integrated health care company, and Aetna has moved beyond being a traditional insurer to focus more on consumer well-being.

> "This is the next step in our journey, positioning the combined company to dramatically further empower consumers.  Together with CVS Health, we will

better understand our members' health goals, guide them through the health care system and help them achieve their best health," said Mark T. Bertolini, Aetna chairman and CEO. "Aetna has a proud tradition of continually innovating to address unmet consumer needs and providing leading products and services to the marketplace."

Bertolini continued, "Aetna has a talented and dedicated group of employees working to build a healthier world every day. Our combined company will be more competitive in the marketplace and accelerate progress toward achieving this mission."

Today, increasing numbers of consumers are taking on more and more responsibility for paying for their health care as the burden of costs is being shifted to them. Together, CVS Health and Aetna will be a trusted community partner who will help consumers better manage the cost of the health care they need. The combined company will also be well positioned to more effectively meet the health needs of many more people, especially the 50 percent of Americans with chronic conditions that account for more than 80 percent of all health care costs. Finally, capabilities developed following this transaction will directly benefit clients of both companies and enable them to better manage their health care costs.

**Insiders' Interests in the Proposed Transaction**

81.      Aetna insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public shareholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and Aetna's public shareholders.

82.      Company insiders stand to reap substantial financial benefits for securing the deal with CVS. Pursuant to the Merger Agreement, each Company performance stock unit and restricted stock unit will be converted into the right to receive the Merger Consideration. In addition to the vast amounts to be received by Defendant Bertolini, Aetna's non-employee directors will receive the following amounts upon consummation of the Proposed Transaction:

| Defendant Aguirre | $4,458,666 |
|---|---|
| Defendant Clark | $8,682,258 |
| Defendant Cohen | $28,669,000 |
| Defendant Coye | $4,958,532 |
| Defendant Farah | $12,237,587 |
| Defendant Garten | $7,593,286 |
| Defendant Hancock | $31,957,429 |
| Defendant Harrington | $10,044,398 |
| Defendant Ludwig | $11,914,632 |
| Defendant Newhouse | $17,028,730 |
| Defendant Snowe | $854,853 |

83.     Additionally, all unvested stock units owed to Aetna's executive officers will vest and Defendant Bertolini and Aetna's other executive officers will receive the following amounts upon consummation of the Proposed Transaction:

| Defendant Bertolini | $479,694,488 |
|---|---|
| Guertin | $20,226,755 |
| Gary Loveman, Executive Vice President and President of Consumer Health Services | $22,486,945 |
| Karen S. Lynch, President | $38,181,591 |
| Thomas J. Sabatino, Jr., Executive Vice President and General Counsel | $10,317,584 |
| Rick M. Jelinek, Executive Vice President, Head of Enterprise Strategy and Markets | $23,419,424 |
| Meg McCarthy, Executive Vice President of Operations and Technology | $44,078,307 |
| Dr. Harold L. Paz, Executive Vice President and Chief Medical Officer | $14,653,877 |
| Fran S. Soistman, Executive Vice President and President of Government Services | $29,049,956 |

84.     Moreover, if they are terminated in connection with the Proposed Transaction, Aetna's named executive officers stand to receive substantial cash severance payments in the form of golden parachute compensation, as follows:

(a)     Defendant Bertolini will receive (i) 24 months of cash compensation, calculated as two times the sum of (a) his highest annual base salary in effect during the six months prior to his termination and (b) his target annual cash bonus opportunity (which equals 120% of

his annual base salary then in effect) and (ii) a pro rata portion of his target cash bonus opportunity for the year of termination (subject in certain circumstances to meeting applicable performance requirements).    Such amounts are payable in equal installments over two years following Bertolini's termination of employment.

(b)    Lynch will receive (i) 24 months of cash compensation, calculated as two times the sum of (a) Lynch's highest annual base salary in effect during the six months prior to her termination and (b) her target cash bonus opportunity for the year of termination of employment (which equals at least 120% of her annual base salary) and (ii) a pro rata portion of her target cash bonus opportunity for the year of termination of employment (subject in certain circumstances to meeting applicable performance requirements).    Such amounts are payable in equal installments over two years following Lynch's termination of employment.    In addition, upon a qualifying termination, Lynch will be treated as retirement eligible for purposes of the vesting and exercise terms of all her outstanding equity awards.

(c)    Guertin will receive 68 weeks of base salary continuation.

(d)    Loveman and Sabatino will receive 52 weeks of base salary continuation.

(e)    Jelinek will receive 52 weeks of base salary continuation and his target annual cash bonus opportunity for the year terminated.

(f)    Paz will receive 56 weeks of base salary continuation.

(g)    McCarthy will receive 100 weeks of base salary continuation.

(h)    Soistman will receive 60 weeks of base salary continuation.

**The Registration Statement Contains Material Misstatements or Omissions**

85.    On January 4, 2018, CVS filed the materially incomplete and misleading joint Registration Statement with the SEC and disseminated it to Aetna's shareholders.    The Registration Statement asks Aetna's pubic shareholders to vote in favor of the Proposed

Transaction, but misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision.

86.     Specifically, as set forth below, the Registration Statement fails to provide Company shareholders with material information or provides them with materially misleading information concerning:  (i) Aetna's financial projections, relied upon by Aetna's financial advisors, Lazard and Allen; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by Lazard and Allen; and (iii) the background process leading to the Proposed Transaction.  Accordingly, Aetna shareholders are being asked to make a voting decision in connection with the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning Aetna's Financial Projections***

87.     The Registration Statement fails to disclose material information relating to the forecasts provided by Aetna's management and relied upon by Lazard and Allen for their analyses.

88.     For example, the Registration Statement provides several non-GAAP financial metrics, including EBITDA, Adjusted EBITDA, Unlevered Free Cash Flow, Adjusted Revenue and Adjusted Earnings, but fails to provide the line item projections used for each of the metrics used to calculate these non- GAAP measures.

89.     The Registration Statement defines Aetna's EBITDA as "earnings before interest, income taxes, depreciation and amortization, excluding certain one-time non-recurring items, as applicable."  The Registration Statement fails to provide values for:  (i) interest; (ii) taxes; (iii) depreciation; (iv) amortization; and (v) the adjustments made to Aetna's 2017 EBITDA.

90.     The Registration Statement also defines Aetna's Adjusted Revenue as "total revenue excluding net realized capital gains or losses and other items, if any, that neither relate to the ordinary course of Aetna's business nor reflect Aetna's underlying business performance."

The Registration Statement fails to provide values for:  (i) total revenue and (ii) any projected net realized capital gains for the years ending December 31, 2017 to 2022, despite including an annual net realized capital gains or losses that ranged from a net realized capital loss of $65 million to a net realized capital gain of $86 million during the calendar years 2014 through 2016.

91.     Another fault in the Registration Statement involves Adjusted Earnings.   The Registration Statement defines Aetna's Adjusted Earnings as "net income, excluding amortization of other acquired intangible assets, net realized capital gains or losses and other items, if any, that neither relate to the ordinary course of Aetna's business nor reflect Aetna's underlying business performance."  The Registration Statement fails to provide values for:  (i) net income and (ii) net realized capital gains or losses.

92.     The Registration Statement also defines Aetna's Adjusted EBITDA as "income before income taxes, excluding interest expense, depreciation and amortization, net realized capital gains or losses and other items, if any, that neither relate to the ordinary course of Aetna's business nor reflect Aetna's underlying business performance."  The Registration Statement fails to provide: (i) income, (ii) income taxes, (iii) interest expense, (iv) depreciation, (v) amortization, and (vi) net realized capital gains or losses.

93.     Finally, the Registration Statement defines Aetna's Unlevered Free Cash Flow as "net income, excluding: (i) net realized capital gains or losses, (ii) other items . . . , (iii) the corresponding income tax benefit or expense related to net realized capital gains . . . ; less (I) risk based capital contributions (distributions), (II) changes in Aetna Inc.'s working capital, (III) after-tax pension plan contributions, (IV) after-tax debt retirement premiums, (V) acquisitions and investments and (VI) after-tax Humana related termination fees; plus (a) after-tax net interest, (b) other net cash flow adjustments and (c) capital projected to be released due to the sale of

Aetna's domestic group life insurance, group disability insurance and absence management businesses." The Registration Statement fails to provide the line item projections used to calculate this non-GAAP measure.

94.     The importance of reconciling between GAAP and non-GAAP financial measures has long been widely acknowledged. The SEC adopted "Regulation G" in 2003, in response to the mandate set forth in Section 401(b) of the Sarbanes-Oxley Act that rules be enacted to regulate the use of pro forma financial information. Regulation G prohibits the use of non-GAAP financial measures outside of SEC filings unless they are accompanied by the most directly comparable GAAP accounting measure, as well as a reconciliation of the two. Such reconciliations were deemed necessary to address the proliferation of non-GAAP financial measures lacking a uniform definition and therefore carrying the risk of misleading investors.

95.     The omission of this information renders the following statements on pages 156-157 of the Registration Statement false and/or materially misleading in contravention of the Exchange Act:

(a)        The following table presents a summary of the supplemental Aetna projections:

|  | Year Ending December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2017P | 2018P | 2019P | 2020P | 2021P | 2022P |
|  | (dollars in billions) | | | | | |
| Aetna Adjusted EBITDA (1) | $5.9 | $6.2 | $6.6 | $7.1 | $7.7 | $8.3 |
| Aetna unlevered free cash flow (2) | 3.4 | 3.5 | 2.8 | 2.5 | 2.8 | 3.0 |

(1)     Aetna adjusted EBITDA means income before income taxes, excluding interest expense, depreciation and amortization, net realized capital gains or losses and other items, if any, that neither relate to the ordinary course of Aetna's business nor reflect Aetna's underlying business performance.

(2)  Aetna unlevered free cash flow means net income, excluding:  (i) net realized capital gains or losses, (ii) other items, if any, that neither relate to the ordinary course of Aetna's business nor reflect Aetna's underlying business performance as described above, (iii) the corresponding income tax benefit or expense related to net realized capital gains or losses and other items, if any, that neither relate to the ordinary course of Aetna's business nor reflect Aetna's underlying business performance that are excluded from net income as described above; less (I) risk based capital contributions (distributions), (II) changes in Aetna Inc.'s working capital, (III) after-tax pension plan contributions, (IV) after-tax debt retirement premiums, (V) acquisitions and investments and (VI) after-tax Humana related termination fees; plus (a) after-tax net interest, (b) other net cash flow adjustments and (c) capital projected to be released due to the sale of Aetna's domestic group life insurance, group disability insurance and absence management businesses.

### *Material Omissions Concerning Lazard's Financial Analyses*

96.    The Registration Statement describes Lazard's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Lazard's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Aetna's public shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Lazard's fairness opinion in making their voting decision with respect to the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Aetna's shareholders.

97.    For example, with respect to Lazard's *Discounted Cash Flow Analysis*, the Registration Statement fails to disclose:  (a) CVS and Aetna's terminal value; (b) the inputs and assumptions underlying the calculation of the perpetuity growth rates ranging from 2.0% to 3.0% used for Aetna; and (c) the inputs and assumptions underlying the calculation of the discount rate range of 7.0% to 8.0% used for Aetna.  *See* Registration Statement 114.

98.    These key inputs are material to Aetna's public shareholders; their omission renders the summary of Aetna's *Discounted Cash Flow Analysis* incomplete and misleading.

99.     With respect to Lazard's *Selected Precedent Transactions Analysis* and *Selected Public Companies Analysis*, the Registration Statement fails to disclose the individual multiples Lazard calculated for each comparable transaction utilized.   The omission of these multiples renders the summary of these analyses and the implied equity value reference ranges materially misleading.   A fair summary of *Selected Precedent Transactions Analysis* and *Selected Public Companies Analysis* requires the disclosure of the individual multiples for each company and transaction; merely providing the range that a banker applied is insufficient, as Aetna shareholders are unable to assess whether the banker applied appropriate multiples or unreasonably low multiples in order to drive down the implied share price ranges.  *See* Registration Statement 115-116.

100.     Additionally, the valuation analyses conducted by Lazard in its fairness opinion show that the value of Aetna's common stock has a greater value than that represented by the Merger Consideration.  Lazard's *Discounted Cash Flow Analysis* indicates an implied per share equity value range of $233 for Aetna, which shows that each Aetna share is worth 112% of the $207.94 Merger Consideration.

101.     The omission of this information renders these statements in the Registration Statement false and/or materially misleading in contravention of the Exchange Act.  Without such undisclosed information, Aetna shareholders cannot evaluate for themselves whether the financial analyses performed by Lazard were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction.   In other words, full disclosure of the omissions identified above is required to ensure that shareholders can fully evaluate the extent to which

Lazard's opinion and analyses should factor into their voting or appraisal decision with respect to the Proposed Transaction.

**Material Omissions Concerning Allen's Financial Analyses**

102.    The Registration Statement describes Allen's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Allen's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Aetna's public shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Allen's fairness opinion in making their voting decision with respect to the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Aetna's shareholders.

103.    For example, with respect to Allen's *Discounted Cash Flow Analysis*, the Registration Statement fails to disclose:  (a) CVS and Aetna's terminal value; (b) the inputs and assumptions underlying the calculation of the perpetuity growth rates ranging from 2.0% to 3.0% used for Aetna; and (c) the inputs and assumptions underlying the calculation of the discount rate range of 7.0% to 8.5% used for Aetna.  *See* Registration Statement 123.

104.    These key inputs are material to Aetna's public shareholders; their omission renders the summary of Aetna's *Discounted Cash Flow Analysis* incomplete and misleading.

105.    With respect to Allen's *Selected Precedent Transactions Analysis* and *Selected Public Companies Analysis*, the Registration Statement fails to disclose the individual multiples Allen calculated for each comparable transaction utilized.  The omission of these multiples renders the summary of these analyses and the implied equity value reference ranges materially misleading.  A fair summary of *Selected Precedent Transactions Analysis* and *Selected Public Companies Analysis* requires the disclosure of the individual multiples for each company and

transaction; merely providing the range that a banker applied is insufficient, as Aetna shareholders are unable to assess whether the banker applied appropriate multiples or unreasonably low multiples in order to drive down the implied share price ranges. *See* Registration Statement 124-25.

106.    The omission of this information renders these statements in the Registration Statement false and/or materially misleading in contravention of the Exchange Act.  Without such undisclosed information, Aetna shareholders cannot evaluate for themselves whether the financial analyses performed by Allen were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction.  In other words, full disclosure of the omissions identified above is required to ensure that shareholders can fully evaluate the extent to which Allen's opinion and analyses should factor into their voting decision with respect to the Proposed Transaction.

***Material Omissions Concerning the Flawed Process***

107.    The Registration Statement also fails to disclose or misstates material information relating to the background process leading up to the Proposed Transaction, including:

(a)    Whether CVS or Aetna initiated conversations regarding CVS's possible acquisition of the Company;

(b)    The strategic opportunities for the Company with Party X and Party Y discussed by the Board throughout 2017;

(c)    The implied per share value indications for the Company in Lazard's and Allen's respective preliminary financial analyses presented to the Board at its October 27, 2017; November 20, 2017; and December 1, 2017 meetings; and

(d)    The specific timing that the parties agreed that Aetna Board members would serve on the board of directors of the combined company.

108.    Defendants' failure to provide Aetna shareholders with the foregoing material information renders the statements in the "Background of the Merger," "Aetna's Reasons for the Merger; Recommendation of the Aetna Board of Directors that Aetna Shareholders Approve and Adopt the Merger Agreement," "Unaudited Prospective Financial Information," and "Opinions of Aetna's Financial Advisors" sections of the Registration Statement false and/or materially misleading and constitutes a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.   The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Registration Statement.   Absent disclosure of the foregoing material information prior to the expiration of the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed voting decision on the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

109.    Plaintiff repeats all previous allegations as if set forth in full.

110.    During the relevant period, Defendants disseminated the false and misleading Registration Statement specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

111.   By virtue of their positions within the Company, the Defendants were aware of this information and of their duty to disclose this information in the Registration Statement.  The Registration Statement was prepared, reviewed, and/or disseminated by the Defendants.  It misrepresented and/or omitted material facts, including material information about the sales process for the Company, the financial analyses performed by the Company's financial advisors, and the actual intrinsic standalone value of the Company.  The Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

112.   The omissions and false and misleading statements in the Registration Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

113.   By reason of the foregoing, the Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

114.   Because of the false and misleading statements in the Registration Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

115.   Plaintiff repeats all previous allegations as if set forth in full.

116.   The Individual Defendants acted as controlling persons of Aetna within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Aetna, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and

control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

117.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

118.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Registration Statement.

119.    In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Registration Statement purports to describe the various issues and information that they reviewed and considered – descriptions the Company directors had input into.

120.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

121.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the

Exchange Act.  As a direct and proximate result of Defendants' conduct, Aetna's shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Aetna, and against Defendants, as follows:

A.   Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.   Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Aetna shareholders;

C.   In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.   Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

E.   Declaring that the Individual Defendants breached their fiduciary duties to Aetna's public shareholders;

F.   Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G.   Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  January 31, 2018

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

By: */s/Shannon L. Hopkins*
Shannon L. Hopkins
733 Summer Street, Suite 3004
Stamford, CT 06901
Tel:  (203) 992-4523
Fax:  (212) 363-7171
Email:  shopkins@zlk.com

*Counsel for Plaintiff*

**OF COUNSEL:**

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato
Todd H. Henderson
885 Third Avenue, Suite 3040
New York, NY 10022
Tel:  (212) 308-5858
Fax:  (212) 214-0506
Email:  fortunato@bespc.com
            henderson@bespc.com

*Counsel for Plaintiff*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, the undersigned Dr. Eli Inzlicht, certify that:

1.      I have reviewed the complaint against Aetna, Inc. ("Aetna") and others and have authorized its filing on my behalf.

2.      I did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      I hold 19 shares of Aetna, Inc. (NYSE: AET) stock as of the date of this certification and have been a holder of Aetna stock at all relevant times.

5.      I have not sought to serve or served as a class representative under the federal securities laws in the last three years.

6.      I will not accept any payment for serving as a representative party beyond the undersigned's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I hereby certify, under penalty of perjury, that the foregoing is true and correct.

Dated: January 23, 2018

Dr. Eli Inzlicht – Sprei.